**WO**

1

2

3

4

5

6                IN THE UNITED STATES DISTRICT COURT

7                    FOR THE DISTRICT OF ARIZONA

8

9   Riki Rashaad Muhammad,              )    No. CV-06-1036-PHX-SMM (LOA)
                                        )
10              Petitioner,             )    **REPORT AND RECOMMENDATION**
                                        )
11  vs.                                 )
                                        )
12  Dora Schriro, et al.,               )
                                        )
13              Respondents.            )
                                        )
14  _____   )

15          On April 23, 2010, the Ninth Circuit Court of Appeals issued its mandate in this

16  case. (Doc. 41)  The Ninth Circuit vacated the denial of Petitioner's Petition for Habeas Corpus

17  Relief and remanded for an evidentiary hearing to address the merits of Petitioner's claim[1] that

18  "trial counsel was ineffective for providing erroneous advice regarding the degree of intent that

19  the state was required to prove at trial.  Muhammad states that his reliance on this erroneous

20  advice led him to reject a plea offer and this fact, coupled with the significant sentencing

21  disparity, is sufficient to demonstrate prejudice."  (Doc. 41-1; Doc. 1 at 11)

22          Thereafter, the Honorable Stephen M. McNamee referred this matter to the

23  undersigned Magistrate Judge to conduct an evidentiary hearing and to issue a Report and

24  Recommendation.  (Doc. 42)   The undersigned appointed Petitioner counsel for purposes of

25  the hearing, which was held on March 3 and 4, 2011.  After consideration of the testimony and

26

27  _____

28      [1]  This claim is identified as Ground VI in Petitioner's Petition for Writ of Habeas Corpus.
    (Doc. 1 at 11)

evidence offered during the hearing, the relevant briefing, and legal authority, the undersigned recommends that Petitioner's request for habeas corpus relief be denied.

## I. Background

### A. Charges, Trial and Sentencing

Based on the death of his two-year-old son, on April 13, 1995, Petitioner was indicted on three counts of child abuse in the Superior Court of Arizona, Maricopa County.[2] (Respondents' Exh. A)  On May 11, 1995, Petitioner, through defense counsel Mara Siegel, moved to remand the case to the grand jury for a redetermination of probable cause. (Respondents' Exh. B)  On September 15, 1995, the court[3] granted the motion and remanded the matter to the grand jury.  (Respondents' Exh. H)  Thereafter, the grand jury indicted Petitioner on the following counts: (1) Count 1: first-degree murder (a class 1 felony), or alternatively, (2) Count 2: second-degree murder (a class 1 felony and dangerous crime against children); (3) Count 3: child abuse under circumstances likely to produce death or serious physical injury (a class 2 felony and dangerous crime against children); and (4) Count 4: child abuse based on failure to obtain medical attention (a class 2 felony and dangerous crime against children).  (Respondents' Exh. I) The State subsequently amended the indictment to allege Petitioner's prior felony conviction for endangerment (a non-dangerous, class 6 felony). (Respondents' Exh. J)

In May of 1996, defense counsel Joel Brown assumed Petitioner's case from Siegel. Petitioner's case proceeded to trial.[4]  During trial, evidence was presented that in 1995, Petitioner's two-year-old son, "T," who resided with his mother in Texas, was staying with Petitioner during a visit to Arizona. (Respondents' Exh. U at 25-28)   At 12:03 a.m. on April

---

[2] At the time of his indictment and trial, Petitioner was known as Richard Warren Miller. He subsequently changed his name to Riki Rashaad Muhammad.  (Respondents' Exh. OO) Unless otherwise indicated, citations to "Respondent's Exh.___" are to exhibits attached to Respondents' Answer, doc. 14.

[3] Judge *pro tem* John J. Trombino presided.

[4] The Honorable Michael O. Wilkinson presided.

3, 1995, Petitioner brought T. to the Phoenix Memorial Hospital. (Respondents' Exh. P at 100-03; Exh. U at 66067)  The child was immediately helicoptered to Phoenix Children's Hospital where he died on April 5, 1995 from swelling of the brain caused by "blunt head trauma." (Respondents' Exh. P at 63-64, 84, 109-114, Q at 135-40; Exh. T at 8-11)  The child arrived at the hospital with multiple bruises and swelling all over his body, including on his head, and had a retinal hemorrhage.  (Respondents' Exh. P at 56-81; Exh. Q. at 136-41)  After conducting a CAT scan, the child was diagnosed with cerebral edema, swelling of the brain.  (Respondents' Exh. P at 56-61; Exh. Q. at 136-41)  Dr. Paul R. Bakerman, who treated the child at 1:00 a.m. and later the next afternoon, assessed, "number one, non[-]accidental trauma. Number two, massive head injury. Number three, multiple bruises." (Respondents' Exh. P at 46-55, 67)  Dr. Bakerman described non-accidental trauma as "an inflicted injury," and noted multiple bruises covering the child's body, "the most significant of which and what led to this child's death, though, was the head injury, possibly in combination with a lack of blood supply or lack of oxygen to the brain." (Respondents' Exh. P at 56)  Dr. Bakerman also explained that the child had a "retinal hemorrhage," which resulted from either shaking or blunt-force injury, such as a blow to the head.  (Respondents' Exh. P. at 71-72)

After Petitioner arrived at the hospital with his son, police officers were called to the hospital. (Respondents' Exh. P at 126-128) Petitioner told Phoenix Police Officer Sylvia Sander, that when his son went to the bathroom in his underwear, Petitioner "whooped him on the butt." (Respondents' Exh. P at 36-37)  Petitioner stated that he either used his belt or a shoe to hit his son and continued hitting him until he "realized the [child's] body had gone limp." (Respondents' Exh. P at 38)  Petitioner tried to "breathe" for his son for 45 minutes, and then drove him to the hospital.  (Respondents' Exh. Q at 38-41)

On December 17, 1996, the jury convicted Petitioner of Counts 1, 3, and 4. (Respondents' Exhs, K, CC)  On February 7, 1997, the trial court sentenced Petitioner. (Respondents' Exhs. CC-DD)  For the conviction for first-degree (felony) murder, the court sentenced Petitioner to life imprisonment with no possibility of release for 35 years. (Respondents' Exh. DD at 18-19)  For the convictions on the two counts of child abuse, the

court sentenced Petitioner to the presumptive term of 17 years' imprisonment. In accordance with Arizona law, the court ordered that all three sentences run consecutively. (Respondents' Exh. DD at 19)

**B.  Direct Appeal**

Petitioner filed a timely petition for review in the Arizona Court of Appeals. (Respondents' Exh. G)  Petitioner had previously filed a notice of post-conviction relief on February 13, 1997, and the court had appointed Petitioner post-conviction counsel. (Respondents' Exh. EE)  The trial court subsequently granted Petitioner's motion to stay post-conviction proceedings to permit Petitioner to pursue direct review first.  (Respondents' Exhs. JJ-KK)

Petitioner raised the following claims on direct appeal:

1.  The jury instructions were deficient in failing to require the jury to find that Petitioner intentionally or knowingly produced death or caused serious physical injury;

2.  The evidence was insufficient to support a predicate offense for felony-murder;

3.  The imposition of consecutive sentences constitutes double punishment in violation of A.R.S. § 13-116;

4.  The child abuse convictions should be set aside under the "merger doctrine;" and

5.  The trial court violated Petitioner's right to self-representation during sentencing. (Respondents' Exh. GG)

On January 27, 1998, the Arizona Court of Appeals rejected Petitioner's first four claims but found that the court had violated Petitioner's right to self-representation during sentencing.  Accordingly, the appellate court remanded for re-sentencing. (Respondents' Exh. LL)  On March 2, 1998, Petitioner filed a motion for reconsideration which the appellate court denied on July 9, 1998.  (Respondents' Exhs. MM, NN, PP)

Petitioner sought review in the Arizona Supreme Court which was denied on February 25, 1999.  (Respondents' Exhs. QQ-SS)

**C.  Remand and Re-sentencing**

On remand, the trial court scheduled the re-sentencing for April 16, 1999, but

continued the re-sentencing hearing after Petitioner requested the assistance of counsel. (Respondents' Exhs. UU,VV)  On June 17, 1999, Petitioner, represented by counsel, filed a motion for a new trial which was denied. (Respondents' Exhs. XX-EEE)  Thereafter, on October 22, 1999, the trial court re-sentenced Petitioner to the same terms it had previously imposed and reaffirmed the stay of post-conviction proceedings.  (Respondents' Exhs. GGG-HHH)

**D.  Appeal after Remand**

After re-sentencing, Petitioner sought review in the Arizona Court of Appeals. Counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), advising the appellate court that he could find no new issues to raise on appeal.  (Respondents' Exh. III) Counsel, however, advised the court that Petitioner wished to raise a claim that the indictment was improperly amended. (*Id.*) Thereafter, Petitioner filed a supplemental *pro se* brief. (Respondents' Exhs. LLL) On August 29, 2000, the Arizona Court of Appeals affirmed Petitioner's convictions and sentences.  (Respondents' Exh. MMM)  On April 26, 2001, the Arizona Supreme Court denied review.  (Respondents' Exhs. SSS,TTT)

**E.  Post-Conviction Proceedings**

Following the conclusion of Petitioner's direct appeal, the post-conviction proceedings resumed.  On January 3, 2002, Petitioner's counsel filed a Notice of Completion, advising the court that he was unable to find any viable issues to raise.  (Respondents' Exh. WWW)  Thereafter, Petitioner filed a *pro se* petition for post-conviction relief, raising several claims of ineffective assistance of counsel.  (Respondents' Exhs. YYY)  On January 29, 2003, the trial court denied the petition for lack of merit.  (Respondents' Exh. HHHH)

Petitioner appealed.  (Respondents' Exh. IIII)  On November 24, 2004, the Arizona Court of Appeals denied review.  (Respondents' Exh. NNNN)  On July 7, 2005, the Arizona Supreme Court denied review.  (Respondents' Exh. QQQQ)

**F.  Petition for Writ of Habeas Corpus**

Thereafter, Petitioner filed a timely Petition for Writ of Habeas Corpus, raising the following seven grounds for relief:

I. The trial court violated Petitioner's right to Due Process because the jury was not properly instructed regarding the predicate offense, child abuse, underlying felony-murder because the instructions did not require a finding of specific intent contrary to Arizona law;

II. The trial court violated Petitioner's right to Due Process by giving a jury instruction which allowed the jury to infer intent from a voluntary act. "Criminal state (sic) 17 has the potential to confuse a jury and should not be given in cases where there is no evidence to support a finding that a defendant has acted unconsciously or without effort and determination;"

III. Petitioner was denied his Sixth Amendment right to notice of the "true nature" of the charges;

IV. Petitioner's right to Due Process was violated because insufficient evidence supported the charge that Petitioner delayed in seeking medical treatment;

V. Petitioner's Sixth Amendment right to effective assistance of counsel was violated because counsel failed to object to erroneous jury instructions regarding the lesser-included child abuse offenses;

VI. Petitioner received ineffective assistance of counsel because counsel was not aware of the *mens rea* requirement of the child abuse statutes which led to Petitioner's refusal of an advantageous plea offer;

VII. Petitioner's consecutive sentences violate the Double Jeopardy Clause.

(Doc. 1) Respondents filed an Answer, asserting that Petitioner procedurally defaulted claims IV and VII and that his remaining claims lack merit. Petitioner filed a Reply in opposition. (Doc. 14) The undersigned issued a Report and Recommendation, recommending that the Petition be denied. (Doc. 22) The district court adopted the Report and Recommendation and the Petition was dismissed. (Docs. 28, 29) Petitioner appealed. The Ninth Circuit vacated the denial of Petitioner's Petition for Habeas Corpus Relief and remanded for an evidentiary hearing to address the merits of Petitioner's claim that "trial counsel was ineffective for providing erroneous advice regarding the degree of intent that the state was required to prove at trial. [Petitioner] argues that his reliance on this erroneous advice led him to reject a plea offer and this fact, coupled with the significant sentencing disparity, is sufficient to demonstrate prejudice." (Doc. 41-1; Doc. 1 at 11) Thus, the only issue before the Court is Petitioner's claim asserted in Ground VI of his Petition.

## II. Standard of Review

This Court's analysis of the merits of Petitioner's claims is constrained by the applicable standard of review set forth in 28 U.S.C. § 2254(d), as amended in 1996 by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). The ADEPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under the law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). The standard in § 2254(d) is "difficult to meet." *Harrington v. Richter*, ___ U.S., ___ , 131 S.Ct. 770, 786 (2011). It is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (quotations and citations omitted) (per curiam). Section "2254 stops short of imposing a complete bar on federal court relitigation of claims already rejected in state court proceedings." *Id.* (citations omitted). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunction in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979)).

Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2). *Mancebo v. Adams*, 435 F.3d 977, 978 (9th Cir. 2006). To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law, courts look exclusively to the holdings of the United States Supreme Court which existed at the time of the state court's decision. *Richter*, ___ U.S. ___, 131 S.Ct. at 786 (citing *Renico v. Lett*, 559 U.S. ____, 130 S.Ct. 1855, 1866 (2010)). Even if the state court neither explained its ruling nor cites United States Supreme Court authority, the reviewing federal court must examine Supreme Court precedent to determine whether the state court reasonably applied federal law. *Richter*, 131 S.Ct. at 784 (citing *Early v. Packer*, 537 U.S. 3,

8 (2003)). The United States Supreme Court in *Early* expressly held, and recently reaffirmed in *Richter*, that citation to federal law is not required and that compliance with the habeas statute "does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *Richter*, 131 S.Ct. at 784. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim', not a component of one, has been adjudicated." *Richter*, 131 S.Ct. at 784.

Under § 2254(d), a state court's decision is "contrary to" federal law if it applies a rule of law "that contradicts the governing law set forth in [Supreme Court] cases or if it confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Mitchell v. Esparza*, 540 U.S 12, 14 (2003) (citations omitted); *Williams v. Taylor*, 529 U.S. 362, 411 (2000). A state court decision is an "unreasonable application of" federal law if the court identifies the correct legal rule, but unreasonably applies that rule to the facts of a particular case. *Williams*, 529 U.S. at 405; *Brown v. Payton*, 544 U.S. 133, 141 (2005). An incorrect application of federal law does not satisfy this standard. *Yarborough v. Alvarado*, 541 U.S. 652, 665-66 (2004) (stating that "[r]elief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable."). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree on the correctness of the state court's decision.'" *Richter*, 131 S.Ct. at 786 (citing *Yarborough*, 541 U.S. at 664). "'[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determination.'" *Richter*, 131 S.Ct. at 786 (citing *Yarborough*, 541 U.S. at 664).

The habeas court presumes that the state court's factual determinations are correct and petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1) (stating that "a determination of factual issues made by a State court shall

- 8 -

be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); *Williams v. Rhoades*, 354 F.3d 1101, 1106 (9th Cir. 2004).

## III.  Analysis

Petitioner argues that he was denied his Sixth Amendment right to effective assistance of counsel because trial counsel misadvised him on the intent element of class 2 felony child abuse.

Petitioner raised this claim on post-conviction review.  (Respondents' Exh. YYY) Petitioner argued that around May of 1996, defense counsel Brown told Petitioner it was his impression that the case was proceeding to trial and stated that the State had offered Petitioner "life, uh - 25 years." (Respondents' Exh. YYY, doc. 14-11 at 62)  Petitioner further stated that his prior counsel, Mara Siegel, had never mentioned a plea offer to him.  (Respondents' Exh. YYY, doc. 14-11 at 62) Petitioner asserted that he rejected a plea offer because Brown erroneously advised him that Arizona's child abuse statute, A.R.S. § 13-3623(B), required the State to prove that Petitioner "intended to cause the head injury to [his] son" or "did so knowing that the circumstance was one likely to produce death or serious physical injury." (Respondents' Exh. YYY at 2-3)  In support of his claim that counsel provided incorrect advice regarding intent, Petitioner referred to the Court of Appeals' decision on direct review where, in the context of reviewing Petitioner's challenge to the jury instructions, the appellate court stated that, when a defendant injures a child, "[h]is mental state concerning the act he takes in inflicting the injury is critical, but his mental state concerning the likelihood of death or serious injury under the circumstances is inconsequential." (Respondents' Exh. YYY at 2; Exh. LL at 6)  The State responded that Petitioner had not presented any evidence that his decision to proceed to trial was based on deficient advice.  (Respondents' Exh. AAAA, doc. 14-12 at 5)  Respondents argued that Petitioner's focus on counsel's advice regarding the intent required under A.R.S. § 13-3623(B)(1), ignored the fact that "there was more than one type of intent involved in this case." (Doc. 14-12 at 6)

The post-conviction court rejected Petitioner's claim of ineffective assistance of

counsel explaining that:

> The petitions[5] claim ineffective assistance at trial by defendant's attorney. In none of the respects claimed did counsel's performance fall below the standard of professionalism required by trial counsel. Even assuming arguendo that there was some deficiency, there is absolutely <u>no</u> evidence that such deficiency would have changed the verdict or sentence.

(Respondents' Exh. HHHH) (emphasis in original)   The Arizona Court of Appeals and Arizona Supreme Court summarily denied review, making decision of the post-conviction court the "last reasoned state court decision" for purposes of § 2254 review. (Respondents' Exh. IIII-TTTT); *see Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007). As set forth below, Petitioner has not shown that the state court's determination was contrary to, or an unreasonable application of, clearly established federal law that existed on January 29, 2003, at the time of the state court's decision.

The relevant federal law governing ineffective assistance of counsel claims is *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a showing of "both deficient performance by counsel and prejudice." *Knowles v. Mirzayance*, 556 U. S. ___, 129 S.Ct. 1411, 1420 (2009). The Sixth Amendment guarantees a criminal defendant effective assistance of counsel during all critical stages of the criminal process, including plea negotiations. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003). Thus, *Strickland's* two-prong test applies to ineffectiveness claims in connection with the plea process. *Hill*, 474 U.S. at 57. The first part of the inquiry is whether counsel's performance was "within the range of competence demanded of attorneys in criminal cases." *Id*. (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). The second part focuses on whether counsel's deficient performance affected the outcome of the plea process. *Hill*, 474 U.S. at 59. Petitioner must establish that he was prejudiced by counsel's deficient performance, *i.e*., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

---

[5] The court referred to petitions in the plural because Petitioner filed a supplemental petition for post-conviction relief. (Respondents' Exhs. BBBB; EEEE)

would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

"'Surmounting *Strickland's* high bar is never an easy task.'" *Richter*, 131 S.Ct. at 788 (quoting *Padilla v. Kentucky*, 559 U.S.___, 130 S.Ct. 1473, 1485 (2010)). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 131 S.Ct. at 788 (quoting *Strickland*, 466 U.S. at 690). Establishing that a state court's application of *Strickland* was unreasonable under §2254(d) is even more difficult, because both standards are "highly deferential," 466 U. S. at 689, and because *Strickland's* general standard has a substantial range of reasonable applications. The issue under §2254(d) is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard. *Id.*, 131 S.Ct. at 788.

The Supreme Court recently addressed the reasons for a "most deferential" standard for judging counsel's performance:

> Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.

*Premo v. Moore*, ___ U.S.___, 131 S.Ct. 733, 739–40 (2011). The Court also recognized that "[p]lea bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks" of a plea. *Id.* at 741. Considerations surrounding these strategic choices in the pre-trial context "make strict adherence to the *Strickland* standard all the more essential when reviewing the choices an attorney made at the plea bargain stage." *Id.*

Mindful of these principles, the Court will consider whether the state court unreasonably applied *Strickland* to the facts of this case. 28 U.S.C. § 2254.

**A. Testimony Presented during Evidentiary Hearing**

The following testimony, relevant to Petitioner's claim of ineffective assistance of counsel, was presented at the evidentiary hearing.

The Honorable Jean Hoag, Maricopa County Superior Court Judge, testified at the

evidentiary hearing. She worked for the Maricopa County Attorneys' Office from 1991 to 1996 and was the prosecutor initially assigned to Petitioner's case. (Doc. 112 at 14[6]) She testified that, during the relevant time, the Maricopa County Attorneys' Office staffed cases in groups and an individual prosecutor would not extend a plea offer on his or her own. (*Id.* at 16-17) She explained that a log is maintained in the case file to keep track of what has occurred. (*Id.* at 19-20) The case log pertaining to Petitioner's case includes a notation dated 9/95 stating, "35 [to] life/drop consecutive child abuse." (Doc. 112 at 20-23; evidentiary hearing exhibit 13) Judge Hoag explained that this notation most likely meant that a plea offer had been extended which included a sentence of 35 years to life - life without the possibility of parole until after serving 35 years - and an agreement to drop the child abuse charges. (*Id.*) She further explained that if any additional plea offers were made, they would have been included in the log. Because the log does not contain any other notations regarding a plea offer, Judge Hoag concluded that the Maricopa County Attorney's Office did not present a second plea offer. (Doc. 112 at 21-23) She did not recall any discussions regarding a plea offer to second degree murder. (*Id.* at 33) Judge Hoag further testified that she recalls the case against Petitioner being a strong one. (*Id.* at 32-33)

JoAnn Garcia took over the prosecution of Petitioner's case in August 1995. (*Id.* at 41) She does not recall any plea negotiations with the defense. She testified that, although there was no written deadline for the plea offer of "35 to life", she recalls that the offer was not open at the time of trial. (*Id.* at 42, 49, 61) She explained that a plea offer would have "some kind of deadline." (*Id.* at 59-60) Garcia testified that around November 1995, defense counsel Joel Brown sent an email, stating that Petitioner would not plead to second degree murder. (*Id.* at 41, 58-59, evidentiary hearing exh. 16) Garcia does not recall making such a plea offer to Petitioner. Garcia further explained that she would have needed her supervisor's approval to extend such an offer, and that it would have been documented in the case log. (*Id.* at 42, 59-60) Garcia

---

[6] Docket 112 is the transcript of day one of the evidentiary hearing, conducted on March 3, 2011. Docket 113 is the transcript of day two of the evidentiary hearing, conducted on March 4, 2011. The page citations refer to the CM/ECF pagination.

testified that it is not uncommon for defense counsel to suggest a possible plea deal. (*Id.* at 56)

She further testified that she did not recall a meeting with defense attorneys Brown and Siegel at the courthouse. (*Id.* at 45) And stated that any such discussions would have been documented in the case log, and the log does not document such a meeting. (*Id.*) Garcia testified that she thought the case was strong because of the physical injuries the two-year-old victim sustained as well as Petitioner's circuitous route to the hospital. Thus, she thought Petitioner would be convicted. (*Id.* at 46, 52, 56)

Mara Siegel represented Petitioner until shortly before trial when Joel Brown took over due to Siegel's health issues. (*Id.* at 82, 184) Siegel testified that she did not recall a plea offer to 35 to life/drop the charges on child abuse. (*Id.* at 81) On cross-examination, Siegel indicated the she recalled the prosecutor having difficulty getting a good plea offer because of her supervisors. Siegel admitted she did not recall the specifics of the "first" plea offer, and was not sure if there was a written plea offer.

Siegel recalled, however, a plea offer to second degree murder that included a sentence of "about 20 years." (*Id.* at 81) She also recalled Garcia extending a written plea offer just before trial that included a sentence between 17 and 22 years. (*Id.* at 82-83) Siegel indicated that the plea offer was extended during a meeting with Brown and Garcia at the courthouse. (*Id.* at 82) On cross-examination, Siegel testified that she did not have a record of written plea offer in her file on Petitioner's case, and explained that she is a "terrible records keeper." (*Id.* at 98) She further stated that she thought the State would reject a lenient plea, and that she thought the State had a "one size fits all" plea offer when a child was killed. (*Id.* at 101)

Siegel testified that she had numerous conversations with Petitioner regarding the risk of trial because the charge was a child homicide with a minimum sentence of 35 years. (*Id.* at 85-86) She also explained the pros and cons of entering a plea; warned Petitioner about the difficulties of the case because juries have "strong feelings" about child abuse, especially when a child dies; told Petitioner she thought there was a good risk of conviction based on the facts of the case; and told Petitioner that whether to enter a plea was his decision. (*Id.* at 86, 92) She

testified that she told Petitioner it would be hard to get an acquittal on first-degree murder because of the facts of the case.  (*Id.* at 90)

Siegel testified that Brown took over the case sometime in 1996 and, at that time, the case was proceeding to trial "because that's what [Petitioner] wanted to do."  (*Id.* at 89)  Siegel testified that Petitioner did not want to plead guilty because he did not feel he had hurt his child and did not think disciplining him was a crime.  (*Id.* at 93)

Joel Brown testified that he took over the case from Siegel in 1996 and made his first appearance in May 1996.  (*Id.* at 112)  Brown testified that when he took the case from Siegel, she indicated that Petitioner should enter a plea because it was a "bad case" and the likelihood of conviction was high, but that Petitioner was not going to do so. (*Id.*)  Brown did not remember any discussions with Petitioner before trial, did not recall any written or verbal plea offers, did not recall any plea discussions with Garcia, and did not remember the circumstances surrounding a November 1995 email that he sent to prosecutor Garcia. (*Id.* at 113)  He was uncertain whether the November 1995 email referred to a plea offer extended by the State, or to his own proposal about a possible plea to second degree murder.  (*Id.* at 125)  Brown further stated that if Garcia had extended a written plea offer, he would have kept it in his file, but his file did not include a written plea offer. (*Id.*)  Brown did not recall discussing the burden of proof or intent with Petitioner, but his practice was to discuss the elements of the offense with his clients.  (*Id.* at 126-27)  He recalls his impression that Petitioner had a small chance of winning at trial.  (*Id.* at 116)  Brown further testified that he does not remember advising Petitioner to accept a plea, but he is sure he did and his practice is to share all plea offers with clients.  (*Id.* at 117, 121)  Brown testified that he thought the case against Petitioner was strong because the victim had unexplained bruising, there was evidence of blunt-force trauma, Petitioner had given inconsistent stories about the incident, Petitioner delayed in seeking medical treatment for the victim, and Petitioner was the sole caretaker during the incident. (*Id.*)  Brown also testified that Petitioner did not want to plead guilty to second degree murder because he didn't think he'd done anything wrong, and he thought the State was offering too much time.  (*Id.* at 125-26)

Petitioner also testified at the evidentiary hearing.  He testified that Siegel had told

him it was a "serious case," that the State had charged him with "heavy stuff." (Doc. 113 at 20) He did not remember talking with Siegel about a plea offer or the intent required for the charges. (*Id.* at 20-21)

Petitioner testified that when Brown took over the case, he told Petitioner the case was going to trial. (*Id.* at 23) Petitioner further testified that Brown told him the State had offered life, or 25 years, or "something like that." (*Id.*) Petitioner testified that Brown "never said that intentionally or knowingly did not apply to the circumstances or conduct." Petitioner further stated that "a dozen to twenty different" times, Brown indicated that the conduct must have been intended or knowingly. (*Id.* at 24) Petitioner testified that Brown mentioned "something about second degree" murder shortly before trial. (*Id.*)

Petitioner testified that shortly before trial, he met with Siegel and she told him it was his last chance to enter plea. (*Id.* at 27-28) Petitioner contends that during the meeting with Siegel and Brown before trial, Siegel mentioned a plea offer of 12-22 years. (*Id.* at 31, 36-38, 42) Petitioner testified that he was told that the jury would have to find that "he did this intending death or serious physical injury or with knowledge that the circumstance[s were] likely to produce death or physical injury." (*Id.*) Petitioner did not want to plead guilty to that mental state because he did not intend to cause death or physical injury. (*Id.*)

Petitioner testified that he had discussed second degree murder with Brown and that he did not want to plead guilty to second degree murder because Brown had told him the mental state was "reckless." (*Id.* at 39)

Petitioner testified that neither Brown nor Siegel ever told him intent could be inferred from an act, and that such information would have changed his opinion of pleading guilty. (*Id.* at 45) Petitioner testified that he would have pled guilty to child abuse charges if he had understood that the prosecution only had to prove that he had hit his son. (*Id.* at 47) He also testified that he was unwilling to plead to second degree murder, manslaughter, or attempted manslaughter because "the sentenc[e] . . . . It was more the sentencing that we couldn't [resolve.]" (*Id.* at 40) Petitioner went on to say, "Second degree [murder] was the charge . . . . [W]hen I spoke to [Brown] about the manslaughter or the attempted it was — it was — the

- 15 -

numbers." (*Id*.)  Petitioner agreed that the issue was "[t]he quantity of time of the sentence." (*Id*.)

**A. Whether Counsel's Performance was Deficient**

As stated above, the post-conviction court found that there was no evidence that trial counsel's performance fell "below the standard of professionalism required by trial counsel." (Respondents' Exh. HHHH)  Under *Strickland*, the reversal of a conviction is required if counsel's errors were so serious that counsel was deficient, and that counsel's "deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.  To be deficient, counsel's representation must have fallen "below an objective standard of reasonableness," *Strickland*, 466 U. S. at 688, and there is a "strong presumption" that counsel's representation is within the "wide range" of reasonable professional assistance. *Id*. at 689; *see also Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S. at 689).  *Strickland* mandates a "strong presumption of competence." *Cullen v. Pinholster*, __ U.S. ___, 131 S.Ct. 1388, 1407 (2011). This Court must "'give [counsel] the benefit of the doubt." *Id*. (citations omitted).

As set forth above, varying versions of the facts surrounding plea negotiations were presented during the evidentiary hearing.  There is strong evidence that the only offer the State extended to Petitioner was a plea that would have entailed a term of life-imprisonment (with the possibility of release after 35 years), and the dismissal of the two child-abuse charges that exposed Petitioner to 17-year presumptive terms of imprisonment that Arizona law requires to run consecutively to each other and consecutively to the first-degree murder sentence.  The evidence that this was the only plea offer extended by the State includes the documentary evidence of the Case Log, the related testimony of the initial prosecutor Jean Hoag (now Judge Hoag), JoAnn Garcia, and Joel Brown - none of whom recalled any other plea offer. (Respondents' Exh. 13; Doc. 112 at 17-25, 38-39, 41-65, 111, 113, 121-22, 126-27).  The only evidence regarding additional plea offers comes from defense counsel Mara Siegel and Petitioner who testified to offers for Petitioner to plead guilty and receive a sentence as low as 17-20 years. Although there is little in the record to corroborate such plea offers, the applicable sentencing statutes suggest that pleas offers including a sentencing range of 17-20 years were plausible. The

parties agree that, at the relevant time, second degree murder carried a presumptive term of 16 years imprisonment that could be mitigated or aggravated as much six years, resulting in a minimum of 10 years and a maximum of 22 years. (Doc. 115, citing A.R.S. § 13-710(A) (1995)). Additionally, because the victim in this case was under the age of fifteen, the sentencing range for second degree murder as a Dangerous Crime Against Children could have applied. In this case, the presumptive term of 20 years could be mitigated or aggravated as much as seven years, resulting in a minimum of 13 years and a maximum sentence of 27 years. (*Id*., citing A.R.S. § 13-604.01(D) (1995)).

Regardless, the Court need not resolve the precise number and nature of plea offers extended to Petitioner. Crediting as true Petitioner's and Mara Siegel's testimony that Petitioner was offered pleas that included a sentencing range of 17 to 20 years, Petitioner testified that he would have rejected such pleas and proceeded to trial.

Petitioner claims that defense counsel failed to provide accurate information regarding the mental state required to obtain a conviction for first-degree murder under A.R.S. § 13-3623(A)(1). Petitioner argues that Brown advised him "that the jury would have to find that I did this *intending death or serious physical injury with the knowledge that the circumstances was one likely to produce death or serious physical injury.* I repeatedly denied wanting to plead guilty to that as a charge because I repeatedly denied doing it with that mental state. So it was clear [to Petitioner and Brown] what the understanding of intentionally and knowingly was." (Doc. 113, Tr. 3/4/11 at 159) (emphasis added). Petitioner argues that Brown misadvised him that the State would have to prove that Petitioner hit his son with the intent to cause death or serious physical injury. Petitioner asserts that Brown should have advised him that the only mental state the State was required to prove at trial was that Petitioner intended to engage in the conduct, hitting his son, and not that Petitioner had intended to cause serious injury or death. Petitioner argues that, had counsel advised him that the State only had to prove that he intended to engage in the conduct, he would have accepted a plea offer from the State.

At the evidentiary hearing, Brown testified that he could not recall his advice to

Petitioner regarding the required mental state under A.R.S. § 13-3623(B)(1). Brown also testified that his practice during the relevant period was to explain the elements of the offense to his clients. (Doc. 112, Tr. 3/3/11 at 125-27) In view of Brown's uncertainty regarding the specific advice he gave Petitioner regarding intent, Respondents' argument focuses on whether Arizona law regarding the mental state required by the child abuse statute, A.R.S. § 13-3623(B)(1), was settled at the time Petitioner was charged and tried in 1995 and 1996.

The child abuse statute at issue, A.R.S. § 13-3623(B)(1) provides, in relevant part that:

> Under circumstances likely to produce death or serious physical injury, any person who causes a child . . . to suffer physical injury [is guilty of child abuse];
>
> 1. If done intentionally or knowingly, the offense is a class 2 felony and if the victim is under fifteen years of age it is punishable pursuant to § 13-604.01.

A.R.S. § 13-3623 (West 1995).

Respondents argue that, before Petitioner was tried in 1996, no Arizona court had directly addressed the *mens rea* required under the child abuse statute A.R.S. § 13-3623(B)(1). Respondents argue that case law "minimally suggested" that the statute required the State to prove that a defendant knew or intended that his actions would cause death or serious physical injury. (Doc. 96 at 11, doc. 120 at 2) (citing *State v. Spyers*, 177 Ariz. 104, 865 P.2d 765, 771 (Ariz. 1993); *State v. Mott*, 183 Ariz. 191, 901 P.2d 1221, 1225 (Ariz.Ct.App. 1995), *vacated on other grounds*, 931 P.2d 1046 (Ariz. 1997). In *Spyers*, the court noted that the crimes of "child abuse and aggravated assault are analogous," and that the "elements of aggravated assault are intentionally, knowingly, or recklessly causing any serious physical injury to another person." *Spyers*, 865 P.2d at 771. Citing the same language, Petitioner asserts that *Spyers* indicates that "intent to injure is all that is required for child abuse." (Doc. 17 at 3-4)

Respondents also cite *Mott* in support of their argument that, before Petitioner's trial, the law was unclear regarding the required state of mind for A.R.S. § 13-3623. In *Mott*, the court discussed whether expert testimony was relevant in a child abuse case to show that the defendant could not form the requisite mental state because she was unable to "accurately assess" the risk of both initially leaving the child with the abuser and subsequently failing to obtain immediate

medical care. *Mott*, 931 P.2d. at 1225. Petitioner asserts that *Mott* does not support Respondents' argument because the case does not directly discuss the "under the circumstances likely to produce death or serious physical injury" clause. (Doc. 117 at 5)  Additionally, Petitioner notes that the *Mott* court found that defendant's "actions were clearly purposeful, thus satisfying the *mens rea* requirement." (*Id.* (quoting *Mott*, 931 P.2d at 1083).

Respondents also argue that Brown's alleged advice, that the State was required to prove that Petitioner intended to cause serious physical injury or death, is supported by A.R.S. § 13-202(A), which provides that when an offense requires a particular mental state, that mental state applies to each element of the offense. Specifically, A.R.S. § 13-202(A) provides that:

> If a statute defining an offense prescribes a culpable mental state, that is sufficient for commission of the offense without distinguishing among the elements of such offense, the prescribed mental state shall apply to each such element unless a contrary legislative purpose plainly appears.

A.R.S. § 13-202(A) (West 1995). Respondents argue that reading the child abuse statute in light of § 13-202(A), a reasonably competent attorney could construe A.R.S. § 13-202(A) as requiring the prosecution to establish that Petitioner had acted "[u]nder circumstances likely to produce death or serious physical injury. . . ." A.R.S. § 13-3623(B)(1). Petitioner counters that, although these definitions are "somewhat difficult to understand by an untrained lay person, . . . [a]n experienced criminal defense attorney . . . should have been able to understand and explain them correctly." (Doc. 117 at 6)

In their Reply, Respondents argue the issue regarding the required mental state was complicated by the existence of case law that supported Petitioner's interpretation that the child abuse statute required the State to prove that a defendant intentionally or knowingly acted "[u]nder circumstances likely to produce death or serious injury. . . ." A.R.S. § 13-3623(B)(1). In other words, Respondents concede that Arizona law in 1995-1996 also supported a finding that the child abuse statute only required the State to prove that Petitioner had engaged in the conduct - hitting his child - that was likely to produce death or serious injury.

On post-conviction review, the Arizona court rejected Petitioner's assertion that trial

- 19 -

counsel's performance was deficient because he misadvised Petitioner about the required mental state. Although the State court did not explain this conclusion, § 2254(d) applies to this summary denial of Petitioner's claim. *Richter*, 562 U.S. at ___, 131 S.Ct. at 786. Presumably, the Arizona courts were familiar with the current state of Arizona law on the child abuse statute, A.R.S. § 13-3623 (B)(1), including the cases and statutes cited by Respondents and Petitioner. Indeed, the Arizona Court of Appeals, which had recently affirmed Petitioner's convictions and held - in the context of reviewing the jury instructions - that "the knowing or intentional mental state referenced in [A.R.S. § 13-3623](B)(1) applies only to the act of causing physical injury," affirmed the trial court's denial of post-conviction relief. And, in view of the law at the time of Petitioner's trial in 1996, the Arizona court concluded that counsel's advice did not render his performance deficient. In assessing counsel's performance, the court applies a "strong presumption of competence." *Cullen v. Pinholster*, __U.S.__, 131 S.Ct. 1388, 1407 (2011) (citing *Strickland*, 466 U.S. at 689, 690). Additionally, this Court's review of the Arizona Court's rejection of Petitioner's claim of ineffective assistance of counsel is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. ___, 129 S.Ct. 1411, 1413 (2009) (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*)). Petitioner must show that "it was unreasonable for the [Arizona Court] to conclude that . . . he had not overcome the strong presumption of competence . . . ." *Pinholster*, 131 S.Ct. at 1403.

Petitioner has not shown that the Arizona court's decision, that he could not demonstrate deficient performance by his trial counsel, involved an unreasonable application of clearly established federal law. Because the post-conviction court summarily denied Petitioner's claim of ineffective assistance, this Court "'must determine what arguments or theories . . . could have supporte[d] the state court's decision . . . .'" *Pinholster*, 131 S.Ct. at 1402 (quoting *Richter*, 562 U.S. at ___, 131 S.Ct. at 786). The post-conviction court may have considered the law regarding A.R.S. § 13-3623(B)(1) unclear - or at least subject to defense counsel's interpretation - before Petitioner's trial in 1996, in view of the fact that the Arizona Court of Appeals cited no prior Arizona case, or any cases for that matter, in support of its decision after Petitioner's trial and sentencing that A.R.S. § 13-3623(B)(1) "applies only to the

act of causing physical injury. . . ." (Respondents' Exh. LL, doc. 14-8 at 103)    The post-conviction court may also have determined that, even if counsel provided inaccurate advice regarding the intent required under the child abuse statute, A.R.S. § 13-3623(B)(1), Petitioner had been charged with other offenses which involved different types of intent, and thus, counsel's advice did not rise to the level of deficient performance. *See McMann v. Richardson*, 397 U.S. 759, 770-71 (1970) ("Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends . . . not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases.").

In any case, Petitioner has not met *Strickland's* high burden of establishing that the State court's conclusion that trial counsel's performance was not deficient was contrary to, or an unreasonable application of, clearly established federal law. Moreover, as discussed below, even assuming counsel's performance was deficient, Petitioner has not established prejudice.

**B. Prejudice**

Even if counsel's performance was constitutionally deficient, Petitioner is not entitled to habeas corpus relief because he fails to demonstrate prejudice. *Strickland*, 466 U.S. at 687. Petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*, 131 S.Ct. at 1403 (quoting *Richter*, 562 U.S. ___, 131 S.Ct. at 791).

The United States Supreme Court has not specifically addressed what constitutes prejudice where a criminal defendant rejects a plea offer and proceeds to trial.  The parties' briefing does not specifically address this issue.  Rather, Petitioner appears to argue that, to establish prejudice, Petitioner must show establish a reasonable likelihood he would have accepted a plea. (Doc. 94)  Respondents first seem to agree, doc. 96 at 14-16, 18-19, then later argue that, because the Supreme Court has not addressed the issue of ineffective assistance of

counsel in a case where a defendant rejects a plea and proceeds to trial, such as in this case, Petitioner cannot establish that the State court's decision was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. (*Id.* at 19-21)

The Supreme Court has held that *Strickland* applies in the context of plea bargaining. *Hill*, *supra*. The Supreme Court has not, however, addressed the specific question of what constitutes prejudice when a petitioner rejects a plea offer and proceeds to a fair trial. For purposes of analyzing Petitioner's claim, the court will consider Ninth Circuit authority.[7] The Ninth Circuit has held that to establish prejudice from incorrect advice resulting in rejection of a plea offer, Petitioner "must show that there is a reasonable probability that he would have accepted the plea agreement had he received accurate advice from his attorney." *Hoffman v. Arave*, 455 F.3d 926, 941-942 (9th Cir. 2006), *judgment vacated in part on other grounds by Arave v. Hoffman*, 552 U.S. 117 (2008); *see also Nunes v. Mueller*, 350 F.3d 1045, 1052 (9th Cir. 2003).

Undoubtedly, Petitioner would prefer a lesser sentence than the one he received. The Court, however, must look to Petitioner's statements and beliefs at the time of trial to determine whether there is a reasonable probability that Petitioner would have pled guilty absent counsel's deficient performance. Petitioner asserts that defense counsel Brown should have advised him that the only mental state the State needed to prove at trial was intent-to-do-the conduct, rather than intent-to-cause-the-injury. Petitioner argues that had counsel advised him that the State only had to prove that Petitioner intended to engage in the conduct, hitting his son, he would have accepted a plea offer from the State.[8]

---

[7] However, as discussed below, while the Ninth Circuit has discussed *Strickland's* prejudice prong in the context of a rejected plea offer, the lack of any Supreme Court holding on that issue precludes a finding that the State court's decision in this case was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *Pinholster*, 131 S.Ct. at 1399 ("State court decisions are measured against [the United States Supreme Court's] precedents as of the 'time the state renders its decision.'") (citations omitted).

[8] In support of his argument that he would have accepted a plea offer, Petitioner presented the testimony of his attorney in a prior case, Ray Vaca. (Doc. 117 at 10-11) As the Court

As set forth above, the nature and number of plea offers extended to Petitioner is unclear. The State has offered evidence that the only offer it extended included a sentence of 35 years to life and dropping the two child abuse charges. Petitioner argues that there were additional plea offers with sentences as low as 17 years. The record includes an email from defense counsel Brown to the prosecutor indicating that Petitioner would not plead guilty to second-degree murder. Regardless of whether the email referenced a plea offer from the State or a proposal from defense counsel, Petitioner did not want to plead to an offense that would not have required the State to show he acted intentionally or knowingly, and which would have provided for a presumptive term of 20 years' imprisonment. *See* A.R.S. § 13-1004(A)(3) (providing that second-degree murder may be committed recklessly); A.R.S. § 13-604.01(A) (providing that the presumptive term of imprisonment for the second-degree murder of a minor is 20 years). Although Petitioner contends that counsel's erroneous advice regarding the state of mind led him to reject a plea offer, he testified that he would not have pled guilty - even to second degree murder or other lesser charges - because "it was the . . . sentencing that we couldn't [resolve.]" (Doc. 113 at 40)

The fact that Petitioner would not plead guilty to second-degree murder, or other lesser charges, undermines his claim by indicating that Petitioner's rejection of a plea in this case was not based solely on counsel's statements regarding the mental state required for intentional

stated during the evidentiary hearing, the circumstances surrounding Mr. Vaca's representation of Petitioner during an unrelated case are irrelevant to the issues in the pending habeas corpus petition. (Doc. 113 at 142)

Petitioner also presented the testimony of his aunt, Joyce Wallace, who worked for the Department of Corrections for over 24 years. (Doc. 117 at 16) Wallace testified that, based on her experience as a parole officer and her knowledge regarding Petitioner's behavior in prison, he would be able to receive parole in 35 years with a sentence of life without the possibility of parole for 35 years. (*Id.*; doc. 113 at 69-72) As the Court noted during the evidentiary hearing, Ms. Wallace's testimony regarding how Petitioner is doing in prison now is not relevant to his claim of ineffective assistance of counsel at the time of his trial in 1996. (Doc. 113 at 71) Petitioner's current behavior is irrelevant to whether he would have accepted a plea offer in 1996.

and knowing child abuse. Rather, Petitioner denied any wrong doing and felt that "he was just disciplining him and that it wasn't a crime." (Doc. 112 at 93, 125-26) Even if counsel misadvised Petitioner regarding the mental state for the most serious charge, Petitioner still rejected purported offers to plea to, apparently, lesser offenses, and proceeded to trial. The only evidence in the record that Petitioner would have accepted some sort of plea offer includes his own self-serving statements in an affidavit made nearly six years after his conviction, and during the evidentiary hearing. (Respondents' Exh. ZZZ) Petitioner does not offer any support for his contention that he would have pled guilty absent counsel's statements regarding the mental state the State would be required to prove for a class 2 felony child abuse conviction. The Ninth Circuit has stated that such self-serving statements are viewed with skepticism:

> [The petitioner's] self-serving statement, made years later, that [defense counsel] told him that 'this was not a death penalty case' is insufficient to establish that [the habeas petitioner] was unaware of the potential death verdict. If the rule were otherwise, every rejection of a plea offer, viewed perhaps with more clarity in the light of an unfavorable verdict, could be relitigated upon the defendant's later claim that had his counsel better advised him, he would have accepted the plea offer.

*Turner v. Calderon*, 281 F.3d 851, 881 (9th Cir. 2002) (internal citations omitted).

Moreover, Petitioner's belief that he had not done anything wrong because disciplining his son was not a crime, does not support his contention that he would have accepted any plea offer. (Respondents' Exh. WW, DDD at 3-17, 21-24; Exh U - doc. 14-6 at 60,105, 127-28); *See Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003) (stating that, although not dispositive, "[p]rotestations of innocence throughout trial are properly a factor" in determining whether a defendant would have accepted a plea); *Jones v. Wood*, 114 F.3d 1002, 1012 (9th Cir. 1997) (concluding that habeas petitioner was not prejudiced by counsel's failure to convey a plea, in part, because of petitioner's "own steadfast and unmoving claims of innocence."). Petitioner testified at trial that he used a belt to potty train his son because that is "the only method" he knew. (Exh U - doc. 14-6 at 69, 77-81, 91) He testified that when he used a belt or shoe to potty train his son, he was "potty training . . . the best way [he knew] how," and that he "felt [he] was doing what [he] had to do or [he] should – was supposed to do." (*Id*. at 126-127)

Additionally, Petitioner has not shown that the State court's conclusion that Petitioner was not prejudiced by counsel's performance is contrary to, or an unreasonable application of Supreme Court precedent that existed at the time of the State court's decision. 28 U.S.C. § 2254. The Supreme Court has interpreted the Sixth Amendment right to effective assistance of counsel as ensuring a criminal defendant a fair trial. *Strickland*, 466 U.S. at 687. The Supreme Court reiterated in *Pinholster* that, "'the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation . . . [but] simply to ensure that criminal defendants receive a fair trial.'" *Pinholster*, 131 S.Ct. at 1403 (quoting *Strickland*, 466 U.S. at 689). The Supreme Court has never held that a defendant who foregoes a plea bargain and is later convicted after a fair trial has suffered a constitutional violation. *See Nunes v. Miller*, 350 F.3d 1045, 1052 -53 (9th Cir. 2003). Rather, the Supreme Court's cases interpreting the Sixth Amendment in the context of plea bargaining have involved cases where the petitioner waived the right to a fair trial by accepting a plea offer, not a case where the petitioner rejected a plea and exercised his right to a fair trial. *See Premo v. Moore*, 562 U.S. ___, 131 S.Ct. 733, 737-40 (2011); *Wright v. Van Patten*, 552 U.S. 120, 124-25 (2008); *Hill*, 474 U.S. at 59; *McMann v. Richardson*, 397 U.S. 759, 760-66 (1970). Although circuit courts, including the Ninth Circuit, have discussed *Strickland's* prejudice prong in the context of a rejected plea offer, the lack of any Supreme Court holding on that issue precludes a finding that the State court's decision in this case was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.[9] *Pinholster*, 131 S.Ct. at 1399 ("State court decisions are measured against [the United States Supreme Court's] precedents as of the 'time the state renders its decision.'") (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)); *Ponce v. Felkner*, 606 F.3d 596, 604 (9th Cir. 2010) ("If Supreme Court cases 'give no clear answer to the question presented,' the state court's decision cannot be an unreasonable application of clearly established

---

[9] The Supreme Court has recently granted certiorari to determine, "What remedy, if any should be provided for ineffective assistance of counsel during plea bargain negotiations if the defendant was later convicted and sentenced pursuant to constitutionally adequate procedures?" *Lafler v. Cooper*, __ U.S.__, 131 S.Ct. 856 (2011).

federal law.") (quoting *Van Patten*, 552 U.S. at 126); *Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009) ("In light of *Musladin*, *Panetti*, and *Van Patten*, we conclude that when a Supreme Court decision does not 'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in these recent decisions . . . , it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue before us, and so we must defer to the state court's decision.") (quoting *Van Patten*, 552 U.S. 120, 125 (2008) (alterations in original); *see also Earp v. Ornoski*, 431 F.3d 1158, 1184 n. 23 (9th Cir. 2005) (describing habeas petitioner's reliance on circuit-court authority as "futile" because, "post-AEDPA[,] only Supreme Court holdings are binding on state courts.") (citing *Lambert v. Blodgett*, 393 F.3d 943, 974 (9ᵗʰ Cir. 2004)).

In sum, Petitioner has not shown that the State court's rejection of his claim of ineffective assistance of counsel was contrary to, or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254.

**IV.  Conclusion**

Based on the foregoing, the Petition should be denied and dismissed because Petitioner's claim of ineffective assistance of counsel, the only claim before the Court, lacks merit.

Accordingly,

**IT IS RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus, doc. 1, be **DENIED.**

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **GRANTED** because Petitioner has made a substantial showing of the denial of a constitutional right.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.  The parties shall have (14) fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  *See,* 28 U.S.C. § 636(b)(1); Rules 72,

6, Federal Rules of Civil Procedure. Thereafter, the parties have (14) fourteen days within which to file a response to the objections. Failure to file timely objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure to file timely objections to any factual determinations of the Magistrate Judge may be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See*, Rule 72, Federal Rules of Civil Procedure.

Dated this 7th day of July, 2011.


Lawrence O. Anderson
United States Magistrate Judge